

Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Peter Smith (SBN 203224)
psmith@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:   (818) 986-9698

Russell Budd (To be admitted *Pro Hac Vice*)
rbudd@baronbudd.com
BARON & BUDD, P.C
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone:  (214) 521-3605
Facsimile:  (214) 520-1181

*FILED*

*DEC 3 1 2012*

*RICHARD W. WIEKING*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*

Attorneys for Plaintiffs CARL A. PAYNE
and KENNETH W. COKER, individually,
and on behalf of other members of the public
similarly situated



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**DMR**

CARL A. PAYNE, KENNETH W. COKER, individually, and on behalf of other members of the general public similarly situated,

Plaintiffs,

vs.

BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BARCLAYS BANK PLC, CITIGROUP, INC., CITIBANK N.A., COOPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., CREDIT SUISSE GROUP, AG, DEUTSCHE BANK AG, HSBC HOLDINGS PLC, HSBC BANK PLC, JPMORGAN CHASE & CO., CHASE BANK USA, N.A., LLOYDS BANKING GROUP PLC, ROYAL BANK OF CANADA, ROYAL BANK OF SCOTLAND, UBS AG and WEST LB AG,

Defendants.

Case Number:

**C 12      6571**

**CLASS ACTION**

**COMPLAINT FOR:**

(1) Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq*.);

(2) Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c)); and

(3) Fraud

**Jury Trial Demanded**

1    For their complaint against Defendants Bank of America Corporation, Bank of

2    America, N.A., Barclays Bank PLC, Citigroup, Inc., Citibank N.A., Cooperatieve

3    Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group, AG, Deutsche Bank AG,

4    HSBC Holdings PLC, HSBC Bank PLC, JPMorgan Chase & Co., Chase Bank USA,

5    N.A., Lloyds Banking Group PLC, Royal Bank of Canada, Royal Bank of Scotland, UBS

6    AG and West LB AG (collectively "Defendants"), Plaintiffs Carl A. Payne and Kenneth

7    W. Coker (collectively "Plaintiffs"), individually, and on behalf of all other members of

8    the public similarly situated, based on information and belief, allege as follows:

9    ## NATURE OF THE ACTION

10   1.    This case concerns the Defendants' manipulation of the London Interbank

11   Offered Rate for the U.S. Dollar (hereafter "LIBOR") during the period March 2007 until

12   March 2011 (the "Manipulation Period"), when U.S. regulators, including the Department

13   of Justice and the Commodities Futures Trading Commission, commenced criminal

14   investigations.  LIBOR is a widely used benchmark interest rate, intended to reflect the

15   average rate at which banks can borrow funds from other banks.  LIBOR is tied to

16   financial agreements worth trillions of dollars, including U.S. residential mortgage loans.

17   2.    Plaintiffs bring this case on behalf of themselves and all U.S. residents who

18   obtained a LIBOR-based Adjustable Rate Mortgage loan during the Manipulation Period.

19   3.    LIBOR is one of the primary indices for setting the interest rates for

20   Adjustable Rate Mortgages in the United States.  During the Manipulation Period,

21   Defendants were members of the LIBOR panel of the British Bankers Association (the

22   "BBA").  The Defendants understood that the BBA publically reports LIBOR as "the

23   primary benchmark for short term interest rates globally and … is used in many loan

24   agreements throughout global markets, including mortgage agreements …"

25   4.    For their own financial gain, Defendants misrepresented their borrowing

26   costs to the BBA, which caused LIBOR to be artificially depressed.  In doing so,

27   Defendants caused each of the Plaintiffs and the class members to incur artificially higher

28   interest rates on their Adjustable Rate Mortgage loans and, consequently, to each pay

1  thousands of dollars, or more, in excess interest payments.

2  ## JURISDICTION AND VENUE

3  5.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter

4  in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000

5  and is a class action in which members of the class of plaintiffs are citizens of states

6  different from Defendants.  Further, greater than two-thirds of the members of the Class

7  reside in states other than the states in which Defendants are citizens.

8  6.      This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331,

9  1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18

10  U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental

11  jurisdiction over the state law claims because all of the claims are derived from a common

12  nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them

13  in one judicial proceeding.

14  7.      Venue lies within this judicial district under 28 U.S.C. § 1391(b), (c) and (d),

15  and under 18. U.S.C. § 1965, because each defendant transacted business in this District

16  and because a substantial part of the events or omissions giving rise to Plaintiffs' claims in

17  this lawsuit occurred, among other places, in this District.

18  8.      Consistent with Northern District of California Civil Local Rule 3-5(b),

19  assignment to the San Francisco or Oakland Division is appropriate under Civil Local

20  Rules 3-2(c) and 3-2(d), because acts giving rise to the claims at issue in this lawsuit

21  occurred, among other places, in this District, in the City of San Francisco.

22  ## THE PARTIES

23  9.      Plaintiff Carl A. Payne is an individual residing in San Francisco, California,

24  and is a citizen of the State of California.

25  10.     Plaintiff Kenneth W. Coker is an individual residing in San Francisco,

26  California, and is a citizen of the State of California.

27  11.     Defendant Bank of America Corporation is a Delaware corporation

28  headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A. is a

1  national banking association incorporated in North Carolina with its principal place of

2  business in Charlotte, North Carolina.  It is a wholly-owned subsidiary of Defendant Bank

3  of America Corporation.  Defendants Bank of America, N.A. and Bank of America

4  Corporation are collectively referred to as "Bank of America."

5        12.    Defendant Barclays Bank PLC ("Barclays") is a British public limited

6  company headquartered in London, England.

7        13.    Defendant Citigroup, Inc. is a Delaware corporation headquartered in New

8  York, New York.

9        14.    Defendant Citibank, N.A. is a wholly-owned subsidiary of Citicorp Holdings,

10  Inc., which is wholly owned by Defendant Citigroup, Inc., a United States financial

11  services corporation headquartered in New York, New York.  Defendants Citibank, N.A.

12  and Citigroup, Inc. are collectively referred to as "Citibank."

13        15.    Defendant Cooperative Centrale Raiffeisen-Boerenleenbank B.A.

14  ("Rabobank") is a financial services company headquartered in Utrecht, the Netherlands.

15        16.    Defendant Credit Suisse Group AG ("Credit Suisse") is a financial services

16  company headquartered in Zurich, Switzerland.

17        17.    Defendant Deutsche Bank AG ("Deutsche Bank") is a financial services

18  company headquartered in Frankfurt, Germany.

19        18.    Defendant HSBC Holdings PLC is a British public limited company

20  headquartered in London, England.  Defendant HSBC Bank PLC is a British public

21  limited company headquartered in London, England and a wholly-owned subsidiary of

22  HSBC Holdings PLC.  Defendants HSBC Holdings PLC and HSBC Bank PLC are

23  collectively referred to as "HSBC."

24        19.    Defendant JPMorgan Chase & Co. is a Delaware financial holding company

25  headquartered in New York, New York.  Defendant JPMorgan Chase Bank, National

26  Association is a federally chartered national banking association headquartered in New

27  York, New York, and a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.

28

20.     Defendant Chase Bank USA, National Association, is a Delaware federally-chartered national banking association headquartered in New York, New York, and is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.  Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A. and Chase Bank USA, N.A. are collectively referred to as "JPMorgan Chase."

21.     Defendant Lloyds Banking Group PLC ("Lloyds") is a British public limited company headquartered in Edinburgh, Scotland.

22.     Defendant Royal Bank of Canada ("RBC") is a financial services company headquartered in Toronto, Canada.

23.     Defendant The Royal Bank of Scotland Group PLC ("RBS") is a British public limited company headquartered in Edinburgh, Scotland.

24.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.

25.     Defendant West LB AG ("West") is a German joint stock company headquartered in Dusseldorf, Germany.

26.     During the Manipulation Period, each of the Defendants listed above was a member of the BBA's U.S. Dollar LIBOR panel.

27.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

## FACTUAL BACKGROUND

28.     Each business day, Thomson Reuters, as agent for the British Bankers Association (the "BBA"), calculates LIBOR on behalf of the BBA.  The BBA describes itself as "the leading trade association for the UK banking and financial services sector" and speaking "for over 200 member banks from 60 countries on the full range of UK and

4

1   international banking issues." The BBA establishes LIBOR based on the rates 16 major
2   banks, including Defendants, report as their costs of borrowing.

3       29.   Each business day, the banks respond to the following question posed by the
4   BBA: "At what rate could you borrow funds, were you to do so by asking for and then
5   accepting inter-bank offers in a reasonable  market size, just prior to 11 [a.m.] London
6   time?" Defendants purported to report to the BBA the actual interest rates they paid on
7   funds they borrowed from other financial institutions -- i.e., their true "borrowing costs."
8   The BBA then relied on the false information Defendants provided to set LIBOR, one of
9   the primary interest rates used to price Adjustable Rate Mortgages in the United States.

10      30.   The Defendants understood that the BBA reported LIBOR as "the primary
11  benchmark for short term interest rates globally and … is used in many loan agreements
12  throughout global markets, including mortgage agreements; and is also considered a
13  barometer to measure the health of financial money markets."

14      31.   The Wall Street Journal similarly observed that confidence in LIBOR
15  "matters, because the rate system plays a vital role in the economy." And, "even a small
16  manipulation" of the rate "could potentially distort capital allocations all over the world."

17      32.   An analyst for a division of Citigroup also noted:

18          LIBOR is by far the most popular floating-rate index in
19          the world.  Its importance has evolved far beyond its humble
20          roots as an interbank lending rate.  LIBOR touches everyone
21          from the largest international conglomerate to the smallest
22          borrower in Peoria.

23      33.   Each Defendant colluded and conspired with the other Defendants to ensure
24  it was not perceived as having the weakest balance sheet.  To that end, analysts at
25  Citigroup Global Markets -- a subsidiary of Defendant Citigroup-- acknowledged in an
26  April 2008 report as follows:

27          [T]he most obvious explanation for LIBOR being set so low is
28          the prevailing fear of being perceived as a weak hand in this

5

fragile market environment.  If a bank is not held to transact at its posted LIBOR level, there is little incentive for it to post a rate that is more reflective of real lending levels, let alone one higher than its competitors.  Because all LIBOR postings are publicly disclosed, any bank posting a high LIBOR level number runs the risk of being perceived as needing funding.  With markets in such a fragile state, this kind of perception could have dangerous consequences.

34.    Defendants also had a material financial incentive to manipulate LIBOR.  Defendants had billions of dollars in interest rate instruments and even a small movement in LIBOR would have substantially impacted their revenues.  Indeed, many of the defendant banks reported increased net interest revenues in the first quarter of 2009, when LIBOR fell dramatically.

35.    Similarly, in 2009 Defendant Citibank reported it would make $936 million in net interest revenue if rates fell by 25 basis points per quarter over the next year and $1.935 billion if rates fell 1%.  Defendant JPMorgan Chase & Co. also reported significant exposure to interest rates in 2009 estimating a loss of over $500 million if interest rates increased.

36.    Defendants HSBC Holdings PLC and Lloyds Banking Group PLC also predicted they would earn hundreds of millions of dollars in 2008-2009 if interest rates fell and would lose similar amounts if interest rates increased.

37.    Throughout the Manipulation Period, Defendants conspired to suppress LIBOR below levels at which it would have been set had they truthfully reported their actual borrowing costs.  Defendants' scheme is evidenced in the behavior of the LIBOR rate, and the rates the Defendants reported to the BBA, which did not properly correlate with other simultaneous economic measures of Defendants' costs of borrowing, such as the Eurodollar Bid Rate.

38.     "Eurodollars" are time deposits for dollars located outside the United States. The "Eurodollar Bid Rate" is the rate of interest offered on such time deposits. In other words, it is the rate offered to attract dollars. Before August 2007, the previous day's Eurodollar Bid Rate was closely aligned with, and was a good predictor of, LIBOR. The Eurodollar Bid Rate had usually tracked 6-12 basis points ("bps") below LIBOR, creating a bid-ask like spread. For example, if the Eurodollar Bid Rate was 2.5% on a given day, the LIBOR on that same day would be expected to be between 2.56% and 2.62%.

39.     Starting in 2007, however, and continuing through the Manipulation Period, the spread inverted, with LIBOR reporting lower than the Eurodollar Bid Rate by substantial amounts.

40.     LIBOR has also been measured against other benchmarks for determining the banks' borrowing costs. For example, the U.S. Federal Reserve prepares and publishes Eurodollar deposit rates for banks (the "Federal Reserve Eurodollar Deposit Rate"). These Eurodollar deposit rates are analogous to LIBOR in that they reflect the rates at which banks in the London Eurodollar money market lend U.S. dollars to one another, just as LIBOR is intended to reflect rates at which panel banks in the London interbank market lend U.S. dollars to one another.

41.     In spite of increased risks and worries about the banks after Lehman Bros. filed for bankruptcy, LIBOR did not keep pace with the Federal Reserve Eurodollar Deposit Rate during this period of heightened concerns.

42.     Comparison between LIBOR and the Federal Reserve auction rate further indicates that the Defendants artificially suppressed LIBOR during the Manipulation Period. An April 16, 2008 Wall Street Journal article, for example, noted the Federal Reserve had recently auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of 2.82% -- 10 basis points higher than the comparable USD-LIBOR rate. The Journal observed: "Because banks put up securities as collateral for the Fed loans, they should get them for a lower rate than Libor, which is riskier because it involves no collateral." A subsequent Journal article raised further concerns about

7

LIBOR's accuracy based on the comparison of one-month LIBOR with the rate for the 28-day Federal Reserve auction.  According to the Journal, because the Federal Reserve requires collateral:

> Banks should be able to pay a lower interest rate [to the Fed] than they do when they borrow from each other because those loans are unsecured.  It is the same reason why rates for a mortgage, which is secured by a house, are lower than those for credit cards, where the borrower doesn't put up any collateral.  In other words, the rate for the Fed auction should be lower than Libor.

43.    To the contrary, though, two days before the Journal article (September 22, 2008), the rate for the 28-day Fed facility was 3.75% -- much higher than one-month USD-LIBOR, which was 3.18% that day and 3.21% the next day.

44.    The Department of Justice has indicated that it "is conducting a criminal investigation into alleged manipulation of certain benchmark interest rates, including LIBORs of several currencies."  The investigation consists of a joint effort by the DOJ's criminal and antitrust divisions.  Authorities are attempting to determine, among other things, "whether banks whose funding costs were rising as the financial crisis intensified tried to mask that trend by submitting artificially low readings of their daily borrowing costs."

45.    On March 15, 2011, UBS disclosed in a Form 20-F (annual report) filed with the SEC that the bank had "received subpoenas" from the SEC, the CFTC, and the DOJ "in connection with investigations regarding submissions to the [BBA]."  UBS stated it understood "that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times."

46.    On March 16, 2011, the Financial Times reported that UBS, BAC, Citigroup, and Barclays received subpoenas from U.S. regulators "probing the setting of" USD-

LIBOR "between 2006 and 2008." The Times further reported that the previous fall, "all 16 members of the committee that helped the [BBA] set the dollar Libor rate during 2006-08 received informal requests for information."

47.     The same day, Market Watch reported "[m]ultiple U.S. and European banks, which provide borrowing costs to calculate Libor every day, have been contacted by investigators," including the DOJ, the SEC, and the CFTC.

48.     The next day, Bloomberg reported that Barclays and Citigroup had received subpoenas from U.S. regulators and that Defendants West, Lloyds, and Bank of America had been contacted by regulators.

49.     On March 23, 2011, Bloomberg reported that Citigroup Inc., Deutsche Bank, BAC, and JPMorgan Chase were asked by U.S. regulators "to make employees available to testify as witnesses" in connection with the regulators' ongoing investigation.

50.     The next day, the Financial Times reported that Defendant Barclays was "emerging as a key focus of the US and UK regulatory probe into alleged rigging of [LIBOR]." According to the Times article, investigators were "probing whether communications between the bank's traders and its treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent information-sharing between different parts of the bank." The Times further reported that investigators were "said to be looking at whether there was any improper influence on Barclays' submissions" during 2006-2008 for the BBA's daily survey used to set LIBOR.

51.     Additionally, in an "Interim Management Statement" filed on April 27, 2011, Barclays revealed that it was "cooperating with" the investigations by the UK Financial Services Authority, the CFTC, the SEC, and the DOJ "relating to certain past submissions made by Barclays to the [BBA], which sets LIBOR rates."

52.     RBS also disclosed, in a Form 6-K filed with the SEC on May 6, 2011, that it was "co-operating with" the investigations conducted by the CFTC, the SEC and the European Commission "into the submission of various LIBOR rates by relevant panel banks."

9

53.    On May 16, 2011, Lloyds revealed that it too "had received requests for information as part of the LIBOR investigation and that it was co-operating with regulators, including the [CFTC] and the European Commission."

54.    On May 23, 2011, the Telegraph reported that the Federal Bureau of Investigation was working with regulators in connection with the LIBOR investigations, and the FBI's British counterpart, the Serious Fraud Office, "revealed it is also taking an active interest."

55.    Additionally, in a Form 6-K filed with the SEC on July 26, 2011, UBS disclosed that it had "been granted conditional leniency or conditional immunity from authorities in certain jurisdictions, including the Antitrust Division of the DOJ, in connection with potential antitrust or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR (Tokyo Interbank Offered Rate)."

56.    Similar to the other Defendants discussed above, HSBC, in an interim report filed in August, 2011, disclosed that it or its subsidiaries had "received requests" from various regulators to provide information and were "cooperating with their enquiries."

57.    On September 7, 2011, the Financial Times reported that as part of their LIBOR investigation, the DOJ and the CFTC were examining "whether traders placed bets on future yen and dollar rates and colluded with bank treasury departments, who help set the Libor index, to move the rates in their direction," as well as "whether some banks lowballed their Libor submissions to make themselves appear stronger."

58.    On October 31, 2011, the Financial News reported that "[a]n investigation into price fixing, first ordered by the [SEC] in 2008, focused on whether banks, including UBS, Citigroup, and Bank of America, had been quoting deliberately low rates."

59.    On June 27, 2012, the DOJ announced that Defendant Barclays had entered into an agreement to pay a $160 million penalty to resolve violations arising from Barclays's LIBOR submissions.  As part of that agreement, Barclays admitted and accepted responsibility for its misconduct as set forth in a "statement of facts" that is incorporated into the agreement.  According to the agreement, Barclays provided LIBOR

submissions that, at various times, were false because they improperly took into account the trading positions of its derivative traders, or reputational concerns about negative media attention relating to its LIBOR submissions. The DOJ noted "[b]ecause mortgages … rely on LIBOR … as reference rates, the manipulation of submissions used to calculate those rates can have significant negative effects on consumers and financial markets worldwide. For years, traders at Barclays encouraged the manipulation of LIBOR and EURIBOR submissions in order to benefit their financial positions; and, in the midst of the financial crisis, Barclays management directed that U.S. Dollar LIBOR submissions be artificially lowered."

60.    On December 19, 2012, the Financial Services Authority issued a "Final Notice" to Defendant UBS, noting that for reasons set forth in the notice, UBS was hit with a financial penalty of £160,000,000. The Notice noted that between January 1, 2005 and December 31, 2010, UBS breached the FSA's Principles for Business through misconduct relating to the calculation of LIBOR.

61.    Defendants' misconduct was self-concealing. Their actual or reasonably expected costs of borrowing were not publicly disclosed, making it impossible for Plaintiffs to detect any discrepancies between Defendants' publicly disclosed LIBOR quotes and other measures of those banks' actual borrowing costs.

## DEFENDANTS' LIBOR MANIPULATION CAUSED INFLATED INTEREST RATES ON ADJUSTABLE RATE MORTGAGES

62.    Mortgage rates are typically established by market forces due to the size of the mortgage loan market and the large number of mortgage lenders. The competition for mortgage loans creates a relatively narrow range of interest rates for loan products.

63.    Unlike a conventional 30-year fixed rate mortgage, where the interest rate is constant for the entire loan period, an Adjustable Rate Mortgage (an "ARM" loan) has an interest rate which varies over time. The key features of an ARM loan are:

- An Index – a reference rate that is used to price an ARM loan. Popular indices include LIBOR, U.S. Treasury Rates, and the Prime

11

Rate.

- A Margin – a set percentage (typically in the range of 2-3%) that is added to the Index for the life of the loan to obtain the "fully indexed rate," or the interest rate paid by the borrower.

- An Initial Rate – the interest rate offered at the loan's inception. The initial rate remains "fixed" for an agreed upon period (typically 1 or 5 years) until the loan "re-prices" (*i.e.* the interest rate "re-sets") at a later date, and periodically thereafter.

64. The Margin on a LIBOR-based ARM loan is set by a lender at the time the loan originates and it is based on the Initial Rate for the loan product. For example if the market rate for an ARM loan on a given day is 6.00%, and LIBOR is at 4.00%, then the Margin is 2% (*i.e.* LIBOR (4%) + Margin (2%) = Initial Rate (6%)). Although the Margin is set at the time the loan is originated, it remains the same for the life of the loan. Thus, after the Initial Rate period ends, the loan's interest rate is re-set based on the agreed upon Margin plus the LIBOR rate published on the day the loan re-resets.

65. The Defendants' manipulation of LIBOR during the Manipulation Period caused all LIBOR-based ARMs that originated during the Manipulation Period to have artificially high Margins applied to the life of the ARM loans. Thus, after the Initial Rate, all borrowers in LIBOR-based ARM loans paid a higher interest rate (typically at least .125% higher) than such borrowers would have paid had LIBOR not been manipulated.

66. For example, in 2007 the average ARM loan had a market rate of approximately 6.5%. If the manipulated LIBOR rate in 2007 was being reported at 4.0%, the interest rate charged to LIBOR-based ARM loan borrowers at origination would be calculated as follows:

| | |
|---|---|
| LIBOR Index Rate (reported): | 4.0% |
| + Margin: | 2.5% |
| = ARM Interest Rate: | 6.5% |

12

67.   However, had LIBOR been accurately reported in 2007 as 4.125% (instead of 4%) the interest rate charged to LIBOR-based ARM loan borrowers at origination would be calculated as follows:

LIBOR Index Rate (actual):   4.125%

\+ Margin:   2.375%

=ARM Interest Rate:   6.5%

68.   Thus, as a result of the Defendants' LIBOR rate manipulation, the Margin actually charged to consumers who obtained a Libor-based ARM loan during the Manipulation Period was at least 0.125% greater than it would have been had the LIBOR rate been accurately reported.  Under the terms of standard ARM loan agreements, this inflated Margin rate is fixed for the entire term of the ARM loan.  Thus, when the interest rate was "re-set" following the Initial Rate period, borrowers were forced to pay more in interest for their LIBOR-based ARM loans than had they would have if the LIBOR rate had been accurately reported.

69.   On or about August 8, 2007, Plaintiff Carl A. Payne obtained a LIBOR-based ARM loan in connection with his purchase of a property in San Francisco, California.

70.   Plaintiff Carl A. Payne's LIBOR-based ARM loan had an Initial Rate of 7.00%, fixed until September 1, 2012.  Thereafter, the interest rate was calculated by taking the then-published LIBOR rate and adding a Margin of 2.250%.  Under the terms of his standard loan agreement, Plaintiff Carl A. Payne's Margin of 2.250% was set for the life of the ARM loan.

71.   On September 1, 2012, the interest rate on Plaintiff Carl A. Payne's LIBOR-based ARM loan "re-set," and his new interest rate was calculated by taking the then-published LIBOR rate and adding the Margin of 2.250%.

72.   Had the Defendants not manipulated the LIBOR rate at the time Plaintiff Carl A. Payne obtained his LIBOR-based ARM loan, his Margin would have been lower by at least .125%.  Thus, when Plaintiff Carl A. Payne's LIBOR-based ARM loan "re-set," his

13

1  interest rate was artificially inflated by at least .125%.

2      73.    On or about May 31, 2007, Plaintiff Kenneth W. Coker obtained a LIBOR-

3  based ARM loan in connection with his purchase of a property located in San Francisco,

4  California.

5      74.    Plaintiff Kenneth W. Coker's LIBOR-based ARM loan had an Initial Rate of

6  6.875%, fixed until June 1, 2012.  Thereafter, the interest rate was calculated by taking the

7  then published LIBOR rate and adding a Margin of 2.75%.  Under the terms of his

8  standard loan agreement, Plaintiff Kenneth W. Coker's Margin of 2.75% was set for the

9  life of the ARM loan.

10     75.    On June 1, 2012, the interest rate on Plaintiff Kenneth W. Coker's LIBOR-

11 based ARM loan "re-set," and his new interest rate was calculated by taking the then

12 published LIBOR rate and adding the Margin of 2.75%.

13     76.    Had the Defendants not manipulated the LIBOR rate at the time Plaintiff

14 Kenneth W. Coker obtained his LIBOR-based ARM loans, his Margin would have been

15 lower by at least .125%.  Thus, when Plaintiff Kenneth W. Coker's LIBOR-based ARM

16 loan "re-set," his interest rate was artificially inflated by at least .125%.

## CLASS ACTION ALLEGATIONS

17

18     77.    Plaintiffs bring this action, on behalf of themselves and all others similarly

19 situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

20     78.    The Class Plaintiffs seek to represent is defined as follows:

21          All residents of the United States of America who obtained a

22          LIBOR-indexed Adjustable Rate Mortgage loan during the

23          Manipulation Period.

24     79.    Plaintiffs reserve the right to amend the Class definitions if discovery and

25 further investigation reveals that the Class should be expanded or otherwise modified.

26     80.    Plaintiffs reserve the right to establish sub-classes as appropriate.

27     81.    This action is brought and properly may be maintained as a class action

28 under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2)

14

1  or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class

2  Members" shall mean and refer to the members of the Class.

3      82.  <u>Community of Interest</u>:  There is a well-defined community of interest

4  among members of the Class, and the disposition of the claims of these members of the

5  Class in a single action will provide substantial benefits to all parties and to the Court.

6      83.  <u>Numerosity</u>:  While the exact number of members of the Class is unknown to

7  Plaintiffs at this time and can only be determined by appropriate discovery, membership

8  in the Class is ascertainable based upon the records maintained by Defendants.  At this

9  time, Plaintiffs are informed and believe that the Class includes hundreds of thousands of

10  members.  Therefore, the Class is sufficiently numerous that joinder of all members of the

11  Class in a single action is impracticable under Federal Rule of Civil Procedure Rule

12  23(a)(1), and the resolution of their claims through the procedure of a class action will be

13  of benefit to the parties and the Court.

14      84.  <u>Ascertainability</u>:  Some names and addresses of members of the Class are

15  available from Defendants' records, and others can be ascertained through appropriate

16  notice.  Notice can be provided to the members of the Class through direct mailing,

17  publication, or otherwise using techniques and a form of notice similar to those

18  customarily used in consumer class actions arising under California state law and federal

19  law.

20      85.  <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the other members

21  of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3)

22  because Plaintiffs and each member of the Class has been subjected to the same deceptive

23  and improper practices and has been damaged in the same manner thereby.

24      86.  <u>Adequacy</u>:  Plaintiffs will fairly and adequately represent and protect the

25  interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4).

26  Plaintiffs are adequate representatives of the Class, because they have no interests which

27  are adverse to the interests of the members of the Class.  Plaintiffs are committed to the

28  vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who

1   are competent and experienced in handling class action litigation on behalf of consumers.

2   87.   Superiority: A class action is superior to all other available methods of the

3   fair and efficient adjudication of the claims asserted in this action under Federal Rule of

4   Civil Procedure 23(b)(3) because:

(a)   The expense and burden of individual litigation make it economically
       unfeasible for members of the Class to seek to redress their claims
       other than through the procedure of a class action.

(b)   If separate actions were brought by individual members of the Class,
       the resulting duplicity of lawsuits would cause members to seek to
       redress their claims other than through the procedure of a class action;
       and

(c)   Absent a class action, Defendants likely would retain the benefits of
       their wrongdoing, and there would be a failure of justice.

88.   Common questions of law and fact exist as to the members of the Class, as
required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions
which affect individual members of the Class within the meaning of Federal Rule of Civil
Procedure 23(b)(3).

89.   The common questions of fact include, but are not limited to, the following:

(a)   Whether Defendants engaged in unlawful, unfair, misleading, or
       deceptive business acts or practices in violation of California Business
       & Professions Code sections 17200 *et seq.*;

(b)   Whether Defendants engaged in a pattern or practice of racketeering,
       as alleged herein;

(c)   Whether Defendants were members of, or participants in the
       conspiracy alleged herein;

(d)   Whether Plaintiffs and members of the class sustained damages, and if
       so, the appropriate measure of damages; and

(e)   Whether Plaintiffs and members of the Class are entitled to an award

16

1    of reasonable attorneys' fees, pre-judgment interest, and costs of this

2    suit.

3    90.    In the alternative, this action is certifiable under the provisions of Federal

4 Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

    (a)    The prosecution of separate actions by individual members of the
Class would create a risk of inconsistent or varying adjudications with
respect to individual members of the Class which would establish
incompatible standards of conduct for Defendants;

    (b)    The prosecution of separate actions by individual members of the
Class would create a risk of adjudications as to them which would, as a
practical matter, be dispositive of the interests of the other members of
the Class not parties to the adjudications, or substantially impair or
impede their ability to protect their interests; and

    (c)    Defendants have acted or refused to act on grounds generally
applicable to the Class, thereby making appropriate final injunctive
relief or corresponding declaratory relief with respect to the Class as a
whole and necessitating that any such relief be extended to members of
the Class on a mandatory, class-wide basis.

91.    Plaintiffs are not aware of any difficulty which will be encountered in the
management of this litigation which should preclude its maintenance as a class action.

## FIRST CLAIM FOR RELIEF
### Violation of Unfair Business Practices Act
### (California Business & Professions Code §§ 17200 *et seq.*)

92.    Plaintiffs incorporate by reference in this cause of action each and every
allegation of the preceding paragraphs, with the same force and effect as though fully set
forth herein.

93.    Plaintiffs bring this cause of action on behalf of themselves and the members
of the Class.

17

94.     California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." For the reasons described above, Defendants have engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq*.

95.     Throughout the Manipulation Period, Defendants suppressed LIBOR by underreporting to the BBA the actual interest rates at which the Defendants expected they could borrow funds -- *i.e.*, their true costs of borrowing -- on a daily basis. The BBA then relied on the false information Defendants provided to set LIBOR. By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be set artificially low.

96.     Defendants' conduct constitutes an unlawful practice because they violate Title 18 United States Code sections 1341, 1343, and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710, and 1711, among others, and the common law.

97.     Defendants' conduct also constitutes an "unfair" business act and practice within the meaning of California Business and Professions Code sections 17200 *et seq.*, in that Defendants' conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous. Plaintiffs also assert a violation of public policy by withholding material facts from consumers. Defendants' violation of California's consumer protection and unfair competition laws in California resulted in harm to consumers.

98.     There were reasonable alternatives available to Defendants to further Defendants' legitimate business interests, other than the conduct described herein.

99.     Defendants' conduct was also fraudulent, misleading, or likely to deceive the public within the meaning of California Business and Professions Code section 17200.

100.    In selecting a LIBOR-based ARM loan, Plaintiffs justifiably relied on their reasonable expectation that Defendants would truthfully report their borrowing costs to the BBA and not manipulate LIBOR. Had the true nature of the understated borrowing costs and interest rate manipulation been disclosed to Plaintiffs and members of the Class,

1    they would not have obtained a LIBOR-based ARM loan.

2        101.   Plaintiffs and members of the Class have been injured in fact and suffered a

3    loss of money or property as a result of Defendants' fraudulent, unlawful, and unfair

4    business practices.

5        102.   Defendants have thus engaged in unlawful, unfair, and fraudulent business

6    acts entitling Plaintiffs and members of the Class to judgment and equitable relief against

7    Defendants, as set forth in the Prayer for Relief.

8        103.   Additionally, under Business and Professions Code section 17203, Plaintiffs

9    and members of the Class seek an order requiring Defendants to immediately cease such

10   acts of unlawful, unfair, and fraudulent business practices, and requiring Defendants to

11   correct their actions.

### SECOND CLAIM FOR RELIEF
### Violations of the Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. § 1962(c))

15       104.   Plaintiffs incorporate by reference in this cause of action each and every

16   allegation of the preceding paragraphs, with the same force and effect as though fully set

17   forth herein.

18       105.   Plaintiffs bring this cause of action on behalf of themselves and the members

19   of the Class.

20       106.   As alleged above, each business day, the Defendants purported to report to

21   the BBA the actual interest rates they paid on funds they borrowed from other financial

22   institutions -- *i.e.*, their true "borrowing costs."  The Defendants made such transmissions

23   to the BBA by means of wire communications, including telephones, email, and faxes.

24   The BBA relied on the false information Defendants provided to set LIBOR, one of the

25   primary interest rates used to price Adjustable Rate Mortgages in the United States.

107.   The Defendants understood that the BBA publically reported LIBOR as "the primary benchmark for short term interest rates globally and ... is used in many loan agreements throughout global markets, including mortgage agreements ...."

108.   18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

109.   Under 18 U.S.C. § 1961(1), and as applicable to Section 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

110.   Defendants' collective association, including by way of the LIBOR panel, and Defendants' participation together as members of the BBA's U.S. Dollar LIBOR panel, constitutes a RICO enterprise.  Every member of the enterprise participated in the process of misrepresenting their costs of borrowing to the BBA.  Using those false quotes to cause the BBA to set LIBOR artificially low, thereby allowing Defendants to increase their net interest revenues, constitutes the common purpose of the enterprise.

111.   For at least four years before this Complaint was filed, Defendants, in concert, made false statements to the BBA for the purpose and with the effect of manipulating LIBOR to be lower than it otherwise would have been.  Defendants earned hundreds of millions, if not billions, of dollars in wrongful profits as a result.

112.   In perpetrating the fraudulent scheme, each Defendant directly or indirectly through its corporate structure has designed and implemented a uniform scheme to manipulate LIBOR. Defendants' daily making and communicating of quotes to the BBA comprise one common, uniform nearly identical system of procedures used in virtually an identical way every day.

113.   For at least the past four years, Defendants have knowingly, intentionally or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by

committing the predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343, by knowingly and intentionally implementing the scheme to make false statements about their costs of borrowing to manipulate LIBOR, which allowed Defendants to reap unlawful profits.

114.   By devising the scheme or artifice to defraud consumers as described herein, Defendants transmitted or caused to be transmitted by means of "wire communication in interstate or foreign commerce, ... writings, signs, signals, [and] pictures," "for the purpose of executing such scheme or artifice," including by: (i) transmitting phony statements about their costs of borrowing to the BBA and (ii) transmitting e-mail communications relating to the process of determining, making or transmitting phony statements about their costs of borrowing.

115.   Plaintiffs are informed and believe that, in addition to the conduct described above, Defendants used the wires in conjunction with reaching their agreement to make false statements about their costs of borrowing to manipulate LIBOR.

116.   Through the racketeering scheme described above, Defendants used the enterprise to improperly increase their profits to the detriment of ARM mortgage holders in different states.

117.   Defendants organized and implemented the scheme, and ensured it continued uninterrupted by concealing their manipulation of LIBOR from ARM mortgage holders, including Plaintiffs.

118.   Defendants knew the scheme would defraud purchasers and holders of LIBOR-based ARMs, yet each Defendant remained a participant despite the fraudulent nature of the enterprise. At any point while the scheme has been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence.  Rather than stopping the scheme, however, the members of the enterprise deliberately chose to continue it, to the direct detriment of ARM mortgage holders such as Plaintiffs.  Plaintiffs suffered injury resulting from the pattern of racketeering activity.

119.   Because Plaintiffs unknowingly paid interest at a manipulated higher rate, Plaintiffs are a direct victim of Defendants' wrongful and unlawful conduct.  Plaintiffs' injuries were direct, proximate, foreseeable and natural consequences of Defendants' conduct.  There are no independent factors that account for Plaintiffs' economic injuries, and the loss of money satisfies RICO's injury requirement.

120.   The pattern of racketeering activity, as described in this Complaint, is continuous and ongoing and will persist unless Defendants are enjoined from perpetuating their racketeering practices.

121.   Plaintiffs, and members of the Class, are entitled to recover treble damages for the injuries they have sustained, according to proof, as well as restitution and costs or suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

122.   As a direct and proximate result of the subject racketeering activities, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

### THIRD CLAIM FOR RELIEF
#### Fraud

123.   Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

124.   Plaintiffs bring this cause of action on behalf of themselves and the members of the Class.

125.   Defendants concealed and suppressed material facts, namely, the fact that they had manipulated the LIBOR rate in order to conceal their true borrowing costs and earn profits.

126.   Plaintiffs justifiably relied on the reasonable expectation that Defendants would act in compliance with the law, which included reporting their true borrowing costs to the BBA and not manipulating LIBOR.

127. Had the true nature of the Defendants' manipulation been disclosed to Plaintiffs and members of the Class, they would not have obtained LIBOR-based ARMs during the Manipulation Period.

128. Defendants knew their concealment and suppression of materials facts was false, misleading, and were fully aware that the false disclosures made to the BBA would be utilized to calculate and publish LIBOR, and, in turn, would be relied upon by Plaintiffs, and members of the Class, in obtaining a LIBOR-based ARM loans.

129. As a result of Defendants' fraudulent omissions and misrepresentations, Plaintiffs and members of the Class have been injured in fact and suffered a loss of money or property. Plaintiffs and members of the Class would not have obtained a LIBOR-based ARM loan, and would not have paid the resulting inflated Margin on such loans, had it not been for Defendants' concealment of material facts.

130. Plaintiffs and members of the Class justifiably relied upon Defendants' knowing, affirmative, and active concealment. By concealing material information about their scheme to manipulate LIBOR, Defendants intended to induce Plaintiffs and members of the Class into believing that LIBOR was accurately calculated.

131. As a direct and proximate result of Defendants' omissions and active concealment of material facts, Plaintiffs and each member of the Class has been damaged in an amount according to proof at trial.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1. Certifying the Class, as requested herein, certifying Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel for the Class;

2. Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged conduct discussed herein;

3. Awarding Plaintiffs and the members of the Class compensatory damages in an amount according to proof at trial;

23

4.     Awarding restitution and disgorgement of Defendants' revenues and/or profits to Plaintiff and members of the Class;

5.     Awarding Plaintiffs and the members of the Class treble damages in an amount according to proof at trial;

6.     Awarding declaratory and injunctive relief as permitted by law or equity;

7.     Awarding Plaintiffs' interest on their damages from the date of collection through the date of entry of judgment in this action;

8.     Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

9.     For such other and further relief as the Court deems just and proper.

Dated:  December 31, 2012

BARON & BUDD, P.C.

By: _____
      Roland Tellis

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Peter Smith (SBN 203224)
Mark Pifko (SBN 228412)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:   (818) 986-9698

Russell Budd (To be Admitted *Pro Hac Vice*)
rbudd@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone: (214) 521-3605
Facsimile: (214) 520-1181

**Attorneys for Plaintiffs**

24

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by

3

law.

4

5

Dated:  December 31, 2012

BARON & BUDD, P.C.

6

7

By: _____

Roland Tellis

8

9

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Peter Smith (SBN 203224)

10

Mark Pifko (SBN 228412)
BARON & BUDD, P.C.

11

15910 Ventura Boulevard, Suite 1600
Encino, California  91436

12

Telephone:  (818) 839-2333
Facsimile:   (818) 986-9698

13

Russell Budd (To be Admitted *Pro Hac Vice*)

14

rbudd@baronbudd.com
BARON & BUDD, P.C.

15

3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219

16

Telephone:  (214) 521-3605
Facsimile:  (214) 520-1181

17

Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT